IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **Michael Dodsworth**<br><br>Plaintiff,<br>vs.<br><br>**MetroHealth System, Jennifer Rogers, Daniel Seidel, Pete Harness, Bryan Brown, Charles Toles, Steven Gall, Adam Doyle, Nathan Moldaver, Ryan Pleau, John Doe 1, Jane Doe 2, John Doe 3**<br><br>Defendants. | Case Number: 1:25-cv-01812-PAB<br><br>Judge: Pamela A. Barker<br><br>Magistrate: Reuben J. Sheperd |

---

**<u>THIRD AMENDED COMPLAINT</u>**

1. Plaintiff Michael Dodsworth ("Dodsworth") files this action to redress his involuntary apprehension by police officers and subsequent ten-day confinement in a hospital and/or mental health facility operated by Defendant MetroHealth System. This confinement has had a profound negative impact on Dodsworth. Said detriment has manifested itself in multiple ways, including loss of earning potential and emotional distress, for which Dodsworth has incurred medical bills.

2. For the purpose of clarity, each count is delineated against each Defendant. For example, count I alleges false imprisonment against multiple Defendants. Count 1(A) is directed at the first Defendant, while Count 1(E) is directed at the fifth Defendant. This naming scheme will enable any party to clearly direct future pleading or filings at specific Defendants.

3. Dodsworth is a resident of Cuyahoga County, Ohio.

**JURISDICTION AND VENUE**

4. This Court has original jurisdiction pursuant to R.C. 2305.01.
5. This Court has concurrent jurisdiction over claims brought pursuant to 42 U.S.C. § 1983.
6. Cuyahoga County, Ohio, is an appropriate venue because all events giving rise to this case occurred within Cuyahoga County, Ohio. Additionally, all parties and relevant individuals live or work in Cuyahoga County, Ohio.

**DEFENDANTS**

7. MetroHealth System ("MetroHealth") is a public hospital system operating in Ohio.
8. Jennifer Rogers ("Rogers") was employed by MetroHealth. Upon information and belief, she was employed as a social worker.
9. Daniel Seidel ("Seidel") is a police officer employed by MetroHealth.
10. Pete Harness ("Harness") is a police officer employed by MetroHealth.
11. Bryan Brown ("Brown") is a police officer employed by MetroHealth.
12. Charles Toles ("Toles") is a police officer employed by MetroHealth.
13. Steven Gall ("Gall") is a police officer employed by MetroHealth.
14. Adam Doyle ("Doyle") is a police officer employed by MetroHealth.
15. Nathan Moldaver ("Moldaver") is a police officer employed by MetroHealth.
16. Ryan Pleau ("Pleau") is a police officer employed by MetroHealth.
17. John Doe 1 is employed by MetroHealth. Upon information and belief, he is employed as a nurse or medical assistant.
18. Jane Doe 2 is employed by MetroHealth. Upon information and belief, she is employed as a nurse.

19. John Doe 3 is employed by MetroHealth. Upon information and belief, he is employed as a nurse or physician.

## RELEVANT INDIVIDUALS

20. Marcus King ("King") is a police officer employed by MetroHealth.

21. Pareena Singh, M.D. ("Singh") is a physician and/or resident employed by MetroHealth.

22. Daniella Caudle ("Caudle") is a physician employed by MetroHealth.

## FACTS

23. Dodsworth lived alone with his dog and had been day drinking alcohol and consuming tetrahydrocannabinol ("THC") on or about April 11, 2024.

24. On or about April 11, 2024, Dodsworth did not respond to a welfare check. Dodsworth was subsequently taken by ambulance to the emergency department of MetroHealth from his home in Cleveland Heights, Ohio.

25. The distance between Dodsworth's home and MetroHealth was approximately 1.3 miles.

26. Dodsworth was admitted to the MetroHealth emergency room on April 11, 2024, while wearing sleepwear without undergarments. Dodsworth also did not have shoes, a cell phone, his wallet, or a watch.

27. Upon information and belief, MetroHealth performed toxicology tests on Dodsworth on or about April 11, 2024. These tests showed the presence of ethanol, THC, and benzodiazepine, which was administered by MetroHealth.

28. Dodsworth was discharged from MetroHealth's emergency department in the morning on April 12, 2024.

29. At the time of his discharge, Dodsworth told MetroHealth that he was waiting for his former neighbor to return to pick him up.

30. Dodsworth was discharged from MetroHealth while wearing the same sleepwear without undergarments that he was wearing when he was admitted. Likewise, Dodsworth did not have shoes, a cell phone, his wallet, or a watch upon his discharge from MetroHealth on April 12, 2024.

31. Dodsworth waited without disturbance for approximately ninety (90) minutes in the MetroHealth emergency department waiting room.

32. Dodsworth waited in a connected portion of the waiting room that can be best described as an “annex,” set apart from the majority of the seating in the waiting room.

33. After approximately ninety (90) minutes, Dodsworth was approached by MetroHealth police officers Seidel, Harness, and King. They confronted Dodsworth about why he was still in the waiting room. Dodsworth told them that he was waiting for a ride.

34. Seidel, Harness, and King were MetroHealth police officers.

35. Other MetroHealth employees gathered in the waiting room, including social worker Rogers. Dodsworth repeated that he was waiting for his ride. In response to questioning, Dodsworth advised he was not suicidal and had no thoughts of harming anyone.

36. Seidel, Harness, King, and Rogers did not disengage from Dodsworth. Said Defendants remained in close proximity to Dodsworth while talking among themselves about Dodsworth.

37. At no point were transportation arrangements, such as a taxi or rideshare, suggested or offered for the approximately 1.3 mile trip to Dodsworth’s home in Cleveland Heights, Ohio.

38. At some point Dodsworth harmlessly engaged the group of employees observing him, including MetroHealth police. Shortly thereafter, without warning, Seidel, Harness, and

King forcibly removed Dodsworth from his seat, strapped Dodsworth horizontally on a gurney, and removed him from the waiting room.

39. Dodsworth non-violently resisted being strapped on the gurney by sliding from his seat to the floor.

40. Dodsworth was forcibly lifted from the floor by the arms and legs by Seidel, Harness, and King and placed on the gurney (the "Restraint").

41. Upon information and belief, Rogers (or potentially another MetroHealth employee), at or about the time of the Restraint, injected Dodsworth with benzodiazepine sufficient to render him unconscious, and later to hallucinate.

42. Upon information and belief, Dodsworth was moved to a different MetroHealth facility or department at some point during his confinement.

43. On or about April 13, 2024, Dodsworth awoke from sedation and attempted to flee. MetroHealth subsequently placed Dodsworth in an isolation room.

44. On April 17, 2024, five days and three court days after Dodsworth's Confinement began, an affidavit for emergency hospitalization under R.C. 5122.01(B) and R.C. 5122.10 was executed by Singh. It is unknown when Singh's evaluation under R.C. 5122.10(E) took place.

45. On or about April 17, 2024, Dodsworth was materially asked by a MetroHealth physician if he "wanted to go down to the psych ward" from the sixth floor, where he had been confined since April 12, 2024.

46. Subsequently, Dodsworth was transferred by ambulance to a different MetroHealth facility and was not permitted to return to his home until the evening of April 22, 2024, after MetroHealth arranged a taxi to return him to his home.

## GENERAL ALLEGATIONS

47. MetroHealth operates a private police department that is authorized to exercise public police functions.

48. MetroHealth is liable for the actions of its employees and/or agents.

49. Individual Defendants were at all relevant times functioning as employees or agents of MetroHealth in a way calculated to facilitate or promote MetroHealth's business within the course and normal scope of their employment.

50. Individual police defendants were at all times also functioning as agents of the State of Ohio performing public police functions.

## COUNT I – FALSE IMPRISONMENT
**METROHEALTH - COUNT I(A)**
**ROGERS - COUNT I(B)**
**JOHN DOE 1 – COUNT I(C)**
**JANE DOE 2 – COUNT I(D)**
**JOHN DOE 3 – COUNT I(E)**

51. Dodsworth reiterates paragraphs 23-50.

52. Dodsworth was in the custody and control of MetroHealth from Friday, April 12, 2024, until the evening of Monday, April 22, 2024 (the "Confinement").

53. MetroHealth forcibly detained Dodsworth against his will during the ten-day Confinement.

54. MetroHealth police officers Seidel, Harness, and King physically detained Dodswoth and strapped him to a gurney in the waiting room.

55. Rogers directed or consented to Dodsworth's Confinement.

56. Dodsworth did not have access to visitors, communication, or the outside world at any point during the Confinement.

57. Dodsworth was not notified of the possible duration of the Confinement, what medical criteria was being assessed, or what legal rights Dodsworth had, or did not have, in relation to the Confinement.
58. MetroHealth did not have authority or privilege to forcibly continue to confine Dodsworth, against his will, for the entirety of the Confinement, regardless of whether MetroHealth had authority or privilege to forcibly remove Dodsworth from the waiting room on April 12, 2024, or detain him for a limited period following an evaluation under R.C. 5122.10(E).
59. Dodsworth was not a threat to MetroHealth, himself, or any other person at the time of the Restraint.
60. Dodsworth verbally and physically demonstrated his desire to be released at various times during the Confinement.
61. MetroHealth knew, or should have known, that there was no privilege justifying Dodsworth's continued Confinement for ten days.
62. Dodsworth complied with some MetroHealth demands during the Confinement because he reasonably feared further detainment and administration of unknown drugs.
63. Singh, Caudle, John Doe 1, Jane Doe 2, and John Doe 3 participated in and continued Dodsworth's confinement.
64. Upon information and belief, a written statement was not provided to MetroHealth by an individual authorized under R.C. 5122.10(A)(1) to initiate an emergency hospitalization of Dodsworth under R.C. 5122.10 on April 12, 2025. Singh's affidavit was executed on April 17, 2025, and does not specify the circumstances under which Dodsworth was detained on April 12, 2025.

65. Dodsworth was not voluntarily admitted pursuant to R.C. 5122.02, other than potentially for the three court days following Singh's evaluation.

66. Upon information and belief, an affidavit under R.C. 5122.11 was not filed.

67. A court did not issue a temporary order of detention applicable to Dodsworth.

68. MetroHealth violated R.C. 5122.10(E) because it sought to initiate emergency hospitalization on April 17, 2025. Even had MetroHealth properly initiated emergency hospitalization on Friday April 12, 2025, Dodsworth was required to have been evaluated no later than Sunday April 14, 2025, and released no later than Wednesday April 17, 2025. Lack of release under these circumstances violated R.C. 5122.10(E).

69. Upon information and belief, the statutory procedure for involuntary confinement in Ohio as defined by Chapter 5122 of the Ohio Revised Code was not followed.

**COUNT II – BATTERY**
**METROHEALTH - COUNT II(A)**
**ROGERS - COUNT II(B)**

70. Dodsworth reiterates paragraphs 23-69.

71. The purposeful contact with Dodsworth by those MetroHealth employees who were not police officers while forcibly removing Dodsworth from a chair in the waiting room, constraining him to a gurney, and injecting him with a substance believed to be benzodiazepine on April 12, 2024, was harmful, offensive, and humiliating.

72. Dodsworth did not consent to be removed from the waiting room, strapped to a gurney, or injected with any substances.

**COUNT III – ASSAULT**
**METROHEALTH - COUNT III(A)**
**ROGERS - COUNT III(B)**

73. Dodsworth reiterates paragraphs 24-72.

74. MetroHealth's purposeful conduct in the waiting room by MetroHealth employees who were not police officers prior to the Confinement caused Dodsworth reasonable apprehension of an imminent attack on his person. Said conduct includes, but is not limited to, multiple armed police officers and other employees surrounding Dodsworth in the waiting room where he was sitting, materially blocking Dodsworth's exit.

**COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**METROHEALTH - COUNT IV(A)**
**JOHN DOE 1 – COUNT IV(D)**
**JANE DOE 2 – COUNT IV(B)**

75. Dodsworth reiterates paragraphs 23-74.

76. Dodsworth was treated without his consent during his Confinement. Each instance of said treatment caused the Confinement to become increasingly extreme and outrageous.

77. Treatment that Dodsworth did not consent to during the Confinement includes, but is not limited to, the forced administration of various drugs, frequent blood draws, and the shaving of Dodsworth's head.

78. In one specific instance on or about April 16, 2024, Dodsworth was covering his head with a pillowcase to block bright fluorescent lights that were never turned off in Dodsworth's room. Jane Doe 2 came in and told Dodsworth to remove the pillowcase from his face so she could draw blood. Dodsworth responded and cooperated by making his arm available, while briefly removing the pillowcase to reveal his face. Jane Doe 2 pulled the pillowcase away from Dodsworth's face at which point Dodsworth sought to pull the pillow back. Jane Doe 2 instructed MetroHealth police officers Doyle, Moldaver, and Pleau to restrain Dodsworth. They jumped on top of Dodsworth, wrestling him, and then forcibly strapped Dodsworth's hands and feet to the bed. Jane Doe 2's actions and instructions to

MetroHealth police officers caused Dodsworth to reasonably apprehend increased violence and detention if he continued to struggle.

79. Dodsworth's hand restraints were so short, he could not adjust his body position or scratch his head for more than six hours.

80. Although a subsequent ultrasound did not show evidence of deep vein thrombosis, the restraint on Dodsworth's left leg was so tight that the limb has not returned to normal functioning as of the date of this filing.

81. In another specific instance, on or about April 15, 2024, Dodsworth fainted after a blood draw. Upon information and belief, a "Code Stroke" was called by MetroHealth. Dodsworth regained consciousness to John Doe 3 twisting his right areola (nipple) piercing with extreme force, causing Dodsworth to cry out in pain.

82. John Doe 3's action caused Dodsworth's piercing to become inflamed and infected.

**COUNT V – MEDICAL NEGLIGENCE**
**METROHEALTH - COUNT V(A)**
**JOHN DOE 3 – COUNT V(B)**

83. Dodsworth reiterates paragraphs 23-82.

84. Unknown physicians employed by MetroHealth were responsible for medically treating Dodsworth during his confinement.

85. Singh is a physician responsible for treating Dodsworth during the Confinement.

86. Caudle is a physician responsible for treating Dodsworth during the Confinement.

87. MetroHealth was responsible for treating Dodsworth during his confinement because it is vicariously responsible for the actions of its employee physicians.

88. To the extent that John Doe 3 is a physician, he is responsible for his medical treatment of Dodsworth during the Confinement. If John Doe 3 is not a physician, he is not named in this count.

89. There is a recognized standard of medical care governing Dodsworth's medical treatment from doctors of medicine ("M.D.) and doctors of osteopathic medicine (D.O.) during the Confinement.

90. Upon information and belief, Dodsworth was administered benzodiazepine on or about April 12, 2025.

91. Unknown physicians breached the standard of care through their participation in the improper administration of drugs, including, but not limited to, benzodiazepine and valium without a factual basis, duplicative testing, and the unlawful detainment of Dodsworth against his will.

92. Singh breached the standard of care by failing to follow the procedures for emergency hospitalization under R.C. 5122.01(B) and R.C. 5122.10 when she executed the affidavit of emergency hospitalization on April 17, 2025, five days and three court days after Dodsworth's Confinement began.

93. Caudle breached the standard of care through her participation in the improper administration of drugs, including, but not limited to, benzodiazepine and valium without a factual basis, duplicative testing, and the unlawful detainment of Dodsworth against his will.

94. John Doe 3 breached the standard of care through his participation in the improper administration of drugs, including, but not limited to, benzodiazepine and valium without

a factual basis, duplicative testing, and the unlawful detainment of Dodsworth against his will.

95. Dodsworth was harmed as a result of the aforementioned actions because drugs were put into his system against his will and his freedom of movement was curtailed against his will during the Confinement.

**<u>COUNT VI – MEDICAL NEGLIGENCE</u>**
**METROHEALTH - COUNT VI(A)**
**ROGERS - COUNT VI(B)**
**JOHN DOE 1 – COUNT VI(C)**
**JANE DOE 2 – COUNT VI(D)**
**JOHN DOE 3 – COUNT VI(E)**

96. Dodsworth reiterates paragraphs 23-82.

97. Rogers, John Doe 1, and Jane Doe 2 are non-physicians responsible for treating Dodsworth during the Confinement under the supervision of physicians employed by MetroHealth.

98. To the extent that John Doe 3 is a non-physician, he is responsible for his treatment of Dodsworth during the Confinement. If John Doe 3 is a physician, he is not named in this count.

99. MetroHealth was responsible for treating Dodsworth during his confinement because it is vicariously responsible for the actions of its non-physician employees.

100. There is a recognized standard of medical care governing Dodsworth's medical treatment during the Confinement.

101. Unknown non-physician employees breached the standard of care through their participation in the improper administration of drugs, including, but not limited to, benzodiazepine and valium without a factual basis, duplicative testing, and the unlawful detainment of Dodsworth against his will.

102. Rogers breached the standard of care through her participation in the improper administration of drugs without a factual basis on or about April 12, 2024, and the unlawful detainment of Dodsworth against his will.

103. John Doe 1 breached the standard of care by through his participation in the improper administration of various drugs without a factual basis, duplicative testing, and the unlawful detainment of Dodsworth against his will. Additionally, on or about April 13, 2024, John Doe 1 lifted Dodsworth's waistband to improperly view Dodsworth genitals without proper notification or warning.

104. Jane Doe 2 breached the standard of care through her participation in the improper administration of various drugs without a factual basis, duplicative testing, and the unlawful detainment of Dodsworth against his will.

105. John Doe 3 breached the standard of care through his participation in the improper administration of various drugs without a factual basis, duplicative testing, manipulation of Dodsworth's body piercings, and the unlawful detainment of Dodsworth against his will.

106. Dodsworth was harmed as a result of the aforementioned actions because drugs were involuntarily put into his system and his freedom of movement was constrained against his will during the Confinement.

## COUNT VII – NEGLIGENT RETENTION AND SUPERVISION METROHEALTH

107. Dodsworth reiterates paragraphs 23-106.

108. MetroHealth employees, including but not limited to the named Defendants, committed various aforementioned acts against Dodsworth.

109. There was an employer-employee relationship between MetroHealth and each of the named Defendants and otherwise-referenced employees in this case.

110. MetroHealth is liable for the actions of its employees.

111. Each Defendant and otherwise-referenced employee was incompetent as evidenced by the aforementioned actions taken against Dodsworth.

112. MetroHealth had actual or constructive notice of the incompetence of its employees because it had actual or constructive knowledge of the actions that its employees took against Dodsworth.

113. Each named Defendant and otherwise-referenced employees caused Dodsworth damage pursuant the aforementioned actions described in this Complaint.

114. MetroHealth's retention of the named Defendants and otherwise-referenced employees was the proximate cause of Dodsworth injuries because Dodsworth would not have been detained or injured had the Defendants and otherwise-referenced employees not acted incompetently.

**COUNT VIII – 42 U.S.C. § 1983 UNCONSTITUTIONAL SEIZURE AND UNREASONABLE USE OF FORCE**
**SEIDEL – COUNT VIII(A)**
**HARNESS – COUNT VIII(B)**

115. This claim is brought against MetroHealth police officers Seidel and Harness (collectively the initial "Officers" for purposes of this claim) in their individual capacity pursuant to 42 U.S.C. § 1983.

116. The Officers are persons as defined by 42 U.S.C. Section 1983.

117. At all times material, the Officers acted under the color of state law because the actions of the Officers occurred while each was exercising the police authority given to them by MetroHealth and the State of Ohio.

118. At all times material, the Officers were state actors performing a public function as police officers.

119. It is clearly established that Dodsworth has a right to be secure from unlawful searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution.

120. Dodsworth reiterates the factual allegations contained in paragraphs 23-72.

121. The actions of the Officers directly resulted in Dodsworth being removed from the hospital waiting room, strapped to a gurney, injected with a drug, seized, and detained against his will—without contact with the outside world for ten days—from April 12, 2024, until April 22, 2024.

122. Dodsworth was not arrested.

123. The Officers did not act reasonably and violated clearly established federal law by forcibly detaining Dodsworth without warning on April 12, 2025.

124. Upon information and belief, the procedures set forth for involuntary confinement in Ohio were not followed before or after Dodsworth's apprehension.

**COUNT IX – 42 U.S.C. § 1983 CONTINUED UNCONSTITUTIONAL SEIZURE AND UNREASONABLE USE OF FORCE**
**BROWN – COUNT IX(A)**
**TOLES – COUNT IX (B)**
**GALL – COUNT IX (C)**

125. This claim is brought against MetroHealth police officers Brown, Toles, and Gall. (collectively the "Officers" for purposes of count IX) in their individual capacity pursuant to 42 U.S.C. § 1983.

126. The Officers are persons as defined by 42 U.S.C. Section 1983.

127. At all times material, the Officers acted under the color of state law because the actions of the Officers occurred while each was exercising the police authority given to them by MetroHealth and the State of Ohio.

128. At all times material, the Officers were state actors performing a public function as police officers.

129. It is clearly established that Dodsworth has a right to be secure from unlawful searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution.

130. Dodsworth reiterates the factual allegations contained in paragraphs 23-72.

131. On or about April 13, 2024, the Officers were dispatched to stop Dodworth from leaving the Confinement.

132. The Officers forcibly escorted Dodsworth back to a room to continue the Confinement.

133. After escorting Dodsworth back to a room, the Officers forcibly held Dodsworth to enable the forced administration of drugs.

134. Dodsworth was not under arrest.

135. The Officers did not act reasonably and violated clearly established federal law by forcibly continuing the Confinement and using force to enable the forced administration of drugs.

136. Upon information and belief, the procedures set forth for involuntary confinement in Ohio were not followed before or after Dodsworth's initial apprehension.

**COUNT X – 42 U.S.C. § 1983 CONTINUED UNCONSTITUTIONAL SEIZURE AND UNREASONABLE USE OF FORCE**
**DOYLE – COUNT X (A)**
**MOLDAVER – COUNT X (B)**
**PLEAU – COUNT X (C)**

137. This claim is brought against MetroHealth police officers Doyle, Moldaver, and Pleau (collectively the "Officers" for purposes of count X) in their individual capacity pursuant to 42 U.S.C. § 1983.

138. The Officers are persons as defined by 42 U.S.C. Section 1983.

139. At all times material, the Officers acted under the color of state law because the actions of the Officers occurred while each was exercising the police authority given to them by MetroHealth and the State of Ohio.

140. At all times material, the Officers were state actors performing a public function as police officers.

141. It is clearly established that Dodsworth has a right to be secure from unlawful searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution.

142. Dodsworth reiterates the factual allegations contained in paragraphs 23-72.

143. On or about April 16, 2024, the Officers were dispatched to restrain Dodsworth.

144. Dodsworth was not under arrest.

145. The Officers force held Dodsworth to continue the Confinement and enable the unreasonable forced administration of drugs.

146. Upon information and belief, the procedures set forth for involuntary confinement in Ohio were not followed before or after Dodsworth's initial apprehension.

**COUNT XI – 42 U.S.C. § 1983 MONELL CLAIM**
**METROHEALTH**

147. MetroHealth is subject to municipal liability because it maintains and controls the MetroHealth Police Department.

148. The MetroHealth Police Department is authorized to and does perform public police functions.

149. MetroHealth has two problematic policies that result in the bypass of constitutional protections and the seizure of individuals by MetroHealth Police.

150. MetroHealth has a systematic policy and practice that MetroHealth Police can and do use force to facilitate the custody of individuals at MetroHealth based exclusively on oral or written assertions from MetroHealth medical staff that a "medical hold" exists.

151. It is also the separate policy of MetroHealth to use a "medical hold" in lieu of emergency involuntary hospitalization under R.C. 5122.10. The result is the involuntary detention of individuals facilitated and enforced by MetroHealth Police without constitutional safeguards or the institution of emergency hospitalization under R.C. 5122.10.

152. A "medical hold" is not the same as emergency hospitalization under R.C. 5122.10.

153. A "medical hold" occurs when a person lacks capacity to make decisions about their care and is not medically stable so, as a result, needs to remain in the hospital.

154. Both policies were the catalyst for or significant contributing factors in Dodsworth's detainment and Confinement from April 12, 2024, through April 22, 2024. Specifically, but for a "medical hold" being placed on Dodsworth by medical staff, he would not have been initially detained on April 12, 2024, or continued to be detained through April 17, 2024. Furthermore, but for MetroHealth's policy of using a "medical"

hold in lieu of emergency hospitalization under R.C.5122.10, Dodsworth could not have been involuntarily detained any later than April 17, 2026.

155. MetroHealth police cannot facilitate the custody of any given individual based exclusively on the oral (or written) assertion of MetroHealth medical staff that a "medical hold" exists. As governmental agents performing public police functions and acting under the color of state law, MetroHealth police are subject to the same rules that govern any other government agent with police powers—namely reasonable suspicion of a crime to detain, probable cause to arrest, and exigent circumstances to act in emergencies. MetroHealth's policies bypasses these and other constitutional safeguards applicable to government agents performing public police functions and acting under the color of state law.

156. The source of these policies is not known. Specifically, it is unknown if MetroHealth's policies (1) are expressly promulgated policies, (2) widespread permanent and well-settled customs or practices constituting the force of law for MetroHealth police, or (3) the result of a single decision from a person with final policy-making authority. Regardless of the source of the policies, the policies are specifically described above and are supported by testimony from multiple individuals.

## DAMAGES

157. Dodsworth's home was entered by his legally separated wife, Alexandria Kung ("Kung"), and potentially other third parties during the Confinement. Dodsworth's property was taken. Dodsworth would not have consented to the taking of his property had he been at his home.

158. As a direct and proximate result of Defendants' actions, Dodsworth suffered bodily injury, physical pain, discomfort, emotional distress, anxiety, mental anguish, incurred direct and indirect medical and hospital expenses, economic loss, lost wages, lost earning potential, and has suffered a loss of enjoyment of life, which will continue into the future.

159. As a direct and proximate result of Defendants' actions, Dodsworth has been disgraced, labeled mentally ill, a danger to himself and others, and subjected to embarrassment and humiliation. Dodsworth has suffered serious physical and mental anguish as a result.

160. The forced administration of drugs caused Dodsworth to hallucinate and take actions that were severely humiliating. These actions include, but are not limited to, sexually touching himself in the presence of others.

161. Dodsworth was required by MetroHealth employees to remove his body piercings. He was not able to reinsert all body piercings after he arrived back at his home April 22, 2024. Dodsworth had maintained these body piercings for more than twenty (20) years.

162. Dodsworth's emotional distress from the aforementioned incidents has caused significant loss of enjoyment of life.

163. Dodsworth has attempted to alleviate his physical and emotional distress. He has incurred medical bills in doing so.

164. Dodsworth emotional distress from the aforementioned incidents has caused loss of earning potential and otherwise economic loss.

## **JURY DEMAND**

165. Dodsworth demands a trial by jury on all issues.

## RELIEF REQUESTED

166. Compensatory damages against each Defendant, jointly and severally, in an amount in excess of $25,000.00.

167. Punitive damages against each Defendant, jointly and severally, in an amount in excess of $25,000.00.

168. Recovery of all costs incurred in the instant case.

169. Prejudgment interest on any judgment beginning on April 12, 2024.

170. An award of reasonable attorney fees based on the aforementioned bad faith acts of the Defendants described in this complaint.

171. An award of reasonable attorney fees for counts VIII, IX, and X based on 42 U.S.C. 1988(b).

172. Any other relief deemed just and equitable.

WHEREFORE, Dodsworth respectfully requests that this Court enter a judgment with the relief requested.

Dated: August 28, 2026

Respectfully submitted,

Joseph Sobecki
405 Madison Avenue, Suite 910
Toledo, Ohio 43604
Office: (419) 283-9282
Facsimile: (419) 242-9937
Email: joseph@josephsobecki.com
Bar Number: FL1030989
*Attorney for Plaintiff, Michael Dodsworth*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was sent via electronic mail on August 28, 2026, to all counsel or parties of record on the service list below.

Joseph Sobecki

Joseph Sobecki

**SERVICE LIST**

**MetroHealth System, et al.**
c/o John A. Favret III
Tucker Ellis LLP
950 Main Avenue, Suite 1100
Cleveland, Ohio 44113-0000
Office: (216) 592-5000
Facsimile: (216) 592-5009
Email: john.favret@tuckerellis.com

**MetroHealth System, et al.**
c/o Taylor Gill
Tucker Ellis LLP
950 Main Avenue, Suite 1100
Cleveland, Ohio 44113-0000
Office: (216) 592-5000
Facsimile: (216) 592-5009
Email: tayler.gill@tuckerellis.com